876 F.2d 209
 57 USLW 2747, 28 Fed. R. Evid. Serv. 445
 UNITED STATES of America, Appellee,
v.
Blanca GARCIA-ROSA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Pedro SOTO-ALVAREZ, a/k/a Junior, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Angel RIVERA-FELICIANO, a/k/a Junior Azuquita, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Victor CARRERA-PEREZ, a/k/a Paye, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Eduardo RIVERA-ORTIZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Jose HEREDIA NIEVES, a/k/a Checo El Perro, Defendant, Appellant.
 Nos. 87-1625-87-1627, 87-1857-87-1859.
 United States Court of Appeals,
First Circuit.
 Heard Nov. 2, 1988.
Decided May 23, 1989.
 
 Antonio Bauza Torres, Guaynabo, P.R., by Appointment of the Court, for appellant Blanca Garcia-Rosa.
 Harry R. Segarra Arroyo, Hato Rey, P.R., by Appointment of the Court, for appellant Pedro Soto-Alvarez.
 Terrance J. McCarthy, by Appointment of the Court, for appellant Angel Rivera-Feliciano.
 Jeffrey M. Williams, Santurce, P.R., for appellant Victor Carrera-Perez.
 Blas C. Herrero, Jr., Hato Rey, P.R., for appellant Eduardo Rivera-Ortiz.
 Jose A. Fuentes Agostini with whom Law Offices of Troncoso & Fuentes Agostini, San Juan, P.R., was on brief for appellant Jose Heredia Nieves.
 Mervyn Hamburg, Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief for appellee.
 Before COFFIN, Circuit Judge, WISDOM,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 The appellants dispute their criminal convictions stemming from two shipments of drugs from Colombia to Puerto Rico. The basic facts, viewed in the light most favorable to the government, see United States v. Sturm, 870 F.2d 769, 770 (1st Cir.1989), are as follows.
 
 The First Shipment
 
 2
 Early in 1984, appellant Pedro Soto Alvarez ("Soto") told his friend Jose Panzardi Alvarez ("Panzardi"), a major drug trafficker, that he had a connection in Venezuela who could supply them with heroin. Panzardi told Soto that he had a supplier in Colombia, but no contacts in Venezuela. Panzardi agreed to contact his Colombian source, Jacobo Mendez Campo ("Mendez"), to determine whether Mendez could transport the heroin from Venezuela to Colombia, from where Panzardi would import it into the United States.
 
 
 3
 Mendez suggested a plan, which Panzardi approved and revealed to Soto. Panzardi and Soto then flew to Venezuela, bought the heroin, and handed it over to the couriers who were to smuggle it into Colombia. Panzardi and Soto then returned to San Juan and began to devise a plan to smuggle the heroin and an additional 7 kilograms of cocaine supplied by Mendez from Colombia to Puerto Rico. Panzardi ultimately hired a pilot to fly to a clandestine airfield in Colombia to pick up the drug shipment and then to drop it in the sea off the coast of Puerto Rico, where Panzardi and Soto would be waiting in a boat to pick it up.
 
 
 4
 The plan was successfully executed in March 1984. The shipment was unpacked in Soto's apartment in San Juan. Panzardi, Soto and appellant Angel Rivera Feliciano diluted the cocaine and sold it. Soto and Rivera Feliciano diluted and sold the heroin, but Soto failed to make full payment to Panzardi for it.
 
 The Second Shipment
 
 5
 In January 1985, Soto's Venezuelan supplier was ready to enter into another transaction. Because Soto had proven unreliable during the prior transaction, the supplier elected to deal directly with Panzardi. Panzardi flew to Caracas and agreed to buy two kilograms of heroin from him at a price of $100,000 per kilogram. Later, Panzardi flew to Colombia and arranged with Mendez to smuggle the heroin into Colombia. During that meeting, Panzardi agreed to purchase three kilograms of cocaine from Mendez and half a kilogram of hydromorphine from an associate of Mendez.
 
 
 6
 Panzardi was short of funds at this time. When he returned to Puerto Rico, he told appellant Victor Carrera Perez ("Carrera") about his monetary problems. A day or so later, Carrera informed Panzardi that he had located an individual, appellant Eduardo Rivera Ortiz, who was willing to loan him the money he needed to finance the proposed drug transaction. Rivera Ortiz agreed to loan Panzardi $20,000 in cash in exchange for one kilogram of cocaine. As collateral, Panzardi agreed to leave his Porsche automobile with Rivera Ortiz.
 
 
 7
 Panzardi used the funds to purchase an airplane in Florida. He then hired two pilots to fly to Colombia, pick up the drug shipment, and drop it in the sea off the coast of Puerto Rico, where Panzardi would be waiting in a boat to pick it up. This operation was duly executed in April 1985 and the drugs were stored in the Caguas residence of Cesar Castro Gomez ("Castro"), an associate of Panzardi.
 
 
 8
 The appellants then began to distribute the shipment.[1] Panzardi diluted one kilogram of cocaine and gave it to Rivera Ortiz to regain possession of his Porsche. Rivera Ortiz subsequently complained about the quality of the cocaine; Panzardi took him to Castro's house where he was allowed to choose another kilogram of cocaine.
 
 
 9
 One of Panzardi's customers was appellant Jose Heredia Nieves ("Heredia"). Panzardi initially gave Heredia a sample for testing. A few days later, after testing it, Heredia agreed to buy an eighth of a kilogram of heroin for $50,000. Heredia made two additional purchases, each of one-eighth of a kilogram of heroin. He returned his last purchase to Panzardi because he was dissatisfied with its quality.
 
 
 10
 Panzardi contacted Rivera Feliciano to help him distribute the shipment. Rivera Feliciano was given two ounces of cocaine to sell. Panzardi and Rivera Feliciano also established a fixed location, a tavern in Bayamon, which was used as a front for retail sales of heroin. To achieve street-level dosage, the heroin was diluted with a non-narcotic substance and then divided into smaller quantities for retail distribution. This processing took place at various locations, including Panzardi's house, Rivera Feliciano's house, and the home of appellant Blanca Garcia Rosa ("Garcia"), Rivera Feliciano's girl friend. At each location, processing of the heroin was performed on multiple occasions.
 
 
 11
 Carrera also assisted Panzardi in distributing the shipment. Panzardi agreed to pay Carrera a $1,000 commission for each ounce of cocaine sold by him. On April 16, Carrera accompanied Panzardi on a sales visit to two potential customers that he had suggested to Panzardi. Despite some interest on the part of each customer, no sale was consummated. Thereafter, Carrera met with Panzardi on other occasions to discuss potential customers, but no sales were ever completed because the customers wanted to make the purchases on credit.
 
 
 12
 Unfortunately for Panzardi, one of his associates, Avelino Cabrera Rios ("Cabrera"), was an informant. On April 18, 1985, ten days after the second shipment of drugs reached Puerto Rico, Panzardi was arrested. At about that time, appellants Garcia, Soto, and Rivera Feliciano were also arrested. They were freed on bail and continued to sell drugs. Sixteen months later, in August 1986, appellants Carrera, Rivera Ortiz, and Heredia were arrested. Cabrera was murdered on November 9, 1987. Panzardi and his girl friend Gloria Nieves Baez ("Nieves") pleaded guilty to conspiring to violate Cabrera's civil rights by killing him, in violation of 18 U.S.C. Sec. 241.[2] They agreed to testify against the members of their own organization.
 
 
 13
 These six appellants in this case, along with twenty five others, were charged in a twelve count indictment with various combinations of the following offenses:
 
 
 14
 Count 1: conspiracy to possess heroin and cocaine with intent to distribute, in violation of 21 U.S.C. Secs. 841(a)(1) & 846
 
 
 15
 Counts 2 & 8: importation of heroin, in violation of 21 U.S.C. Secs. 952 & 960, and 18 U.S.C. Sec. 2
 
 
 16
 Counts 3 & 9: importation of cocaine, in violation of 21 U.S.C. Secs. 952 & 960 and 18 U.S.C. Sec. 2
 
 
 17
 Counts 4 & 11: possession of heroin with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2
 
 
 18
 Counts 5 & 12: possession of cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2
 
 
 19
 Counts 6 & 7: travel in interstate and foreign commerce to facilitate the carrying on of unlawful activity, in violation of 18 U.S.C. Sec. 1952
 
 
 20
 Count 10: importation of hydromorphine, in violation of 21 U.S.C. Secs. 952 & 960 and 18 U.S.C. Sec. 2
 
 
 21
 These six appellants were tried jointly with five other defendants. Panzardi's testimony was the heart of the government's case. Each defendant was convicted on all the counts in which he or she was named. The following sentences were imposed:
 
 
 22
 Rivera Ortiz (counts 1, 8-12)--imprisonment for five years on count 1; concurrent terms of imprisonment for 13 years on counts 8, 9, and 10, to run consecutively to the sentence imposed on count 1; concurrent 13-year terms on counts 11 and 12, to run concurrently with the sentences on the other counts; fines of $25,000 on count 1, $20,000 each on counts 8-10 and $10,000 each on counts 11 and 12.
 
 
 23
 Heredia (counts 1 and 11)--consecutive terms of imprisonment of 20 years on each count; fines of $50,000 and $25,000.
 
 
 24
 Garcia (counts 1 and 11)--imprisonment for six years on each count, the sentences to run concurrently.
 
 
 25
 Soto (counts 1-6)--imprisonment for 15 years on count 1; concurrent terms of imprisonment for 10 years on counts 2-5, to run consecutively to the sentence imposed on count 1; imprisonment for 5 years on count 6, to run consecutively to punishment on the other counts; fines of $25,000 on count 1, $15,000 on counts 2 and 3, and $10,000 on counts 4 and 5.
 
 
 26
 Rivera Feliciano (counts 1, 5, 11, 12)--concurrent terms of imprisonment for 15 years on each count; $10,000 fine on count 5.
 
 
 27
 Carrera (counts 1 and 11)--consecutive terms of imprisonment for five and ten years, fines of $25,000 and $20,000.
 
 
 28
 We turn now to the objections raised by each appellant.
 
 A. Eduardo Rivera Ortiz (No. 87-1858)
 
 29
 Rivera Ortiz was convicted on counts 1, 8, 9, 10, 11, and 12. He appeals his convictions on the following grounds. First, he argues that the evidence was insufficient to justify his convictions. Second, he argues that the trial judge erred in failing to suppress the evidence discovered at his home while he was being arrested. Third, even if this evidence should not have been suppressed, he argues that it should not have been admitted at trial. Fourth, he argues that the trial judge incorrectly denied his motion for a separate trial.
 
 
 30
 1. Rivera Ortiz argues that there was insufficient evidence to support count 1 (conspiracy) because the evidence, considered in the light most favorable to the government, did not prove that he intended to join the illegal enterprise with the desire to further it. He argues that proof that he lent money to someone who intended to use it for an illegal purpose is not enough to support a conviction for conspiracy, relying on United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), aff'g 109 F.2d 579 (2d Cir.1940) (L. Hand, J.). We do not find this argument persuasive. Falcone stands for the narrow proposition that a defendant cannot be convicted of conspiracy for providing supplies to a conspiracy if the defendant did not know about the existence of the conspiracy. Falcone, 311 U.S. at 210, 61 S.Ct. at 206-207; see Direct Sales Co. v. United States, 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943). Moreover, knowledge of the existence of the conspiracy will not be inferred merely from the fact that the seller knew that the buyer would use the purchased supplies for an illegal purpose. See Direct Sales, 319 U.S. at 709, 63 S.Ct. at 1268. Falcone is of no avail to Rivera Ortiz, however, because there is ample unequivocal evidence to support the conclusion that Rivera Ortiz knew that Panzardi and his confederates had conspired to use the loan proceeds to buy an aircraft for the purpose of smuggling drugs into the United States. Mere knowledge of the existence of a conspiracy, however, is not a sufficient predicate for imposing conspiracy liability on a person who sells goods to the conspiracy. Direct Sales, 319 U.S. at 711, 63 S.Ct. at 1269. The "gist" of conspiracy is the seller's intent, through the sale, "to further, promote and cooperate" in the conspiracy. Id. There is ample evidence to support the conclusion that Rivera Ortiz played an active, interested, and informed role in the conspiracy, and thereby crossed the "shadowy border between lawful cooperation and criminal association." Id. at 713, 63 S.Ct. at 1270. Rivera Ortiz' loan was integral to the success of the conspiracy. Rivera Ortiz was not in the business of lending. This particular loan did not feature the traditional formalities of a loan, such as a writing. Most important, Rivera Ortiz was to be repaid with a kilogram of cocaine, giving him a vested interest in the outcome of the conspiracy. See United States v. Zambrano, 776 F.2d 1091, 1095 (2d Cir.1985); United States v. Rush, 666 F.2d 10, 11-12 (2d Cir.1981) (per curiam); Falcone, 109 F.2d at 581.
 
 
 31
 Next, Rivera Ortiz argues that he cannot be guilty of the three importation counts (8, 9, and 10) because he did not know that heroin, cocaine, and hydromorphine were to be imported. He contends that knowledge of the substance actually imported is an element of the offense and must be proved beyond a reasonable doubt. This is an incorrect statement of the law. We have previously held that 21 U.S.C. Sec. 952 only requires knowledge that the imported substance is a controlled substance, not knowledge of which controlled substance it actually is. See United States v. Kairouz, 751 F.2d 467, 468-69 (1st Cir.1985). Even Rivera-Ortiz does not contend that there was insufficient evidence to prove that he knew the imported substance was a controlled substance.
 
 
 32
 Rivera Ortiz also argues that his conviction on count 10 (importation of hydromorphine) cannot stand because the government failed to prove beyond a reasonable doubt that one of the substances imported was hydromorphine. He points out that the government offered no scientific evidence to that effect. The government responds--correctly--that the nature of a substance can be proved circumstantially. See United States v. Drougas, 748 F.2d 8, 15 (1st Cir.1984). We hold that there was sufficient circumstantial evidence to allow a jury to find beyond a reasonable doubt that the substance in question was hydromorphine. Panzardi referred to it as hydromorphine. It was smuggled into Puerto Rico and then concealed in the same manner as the cocaine and the heroin. Rivera Ortiz makes too much out of Panzardi's inability to process the substance into a marketable form; this failure could just as well be attributed to Panzardi's inexperience with hydromorphine.
 
 
 33
 Rivera Ortiz argues that his conviction on count 11 cannot stand because he did not possess any of the heroin in question and because he never exercised any control over it. Even if it was factually sound, this argument fails because Rivera Ortiz could nonetheless be held liable as an aider and abetter.[3] See United States v. Martin, 747 F.2d 1404, 1407 (11th Cir.1984); United States v. Kegler, 724 F.2d 190, 200-01 (D.C.Cir.1983). It is well settled that a culpable aider and abetter need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution. See United States v. Hernando Ospina, 798 F.2d 1570, 1581-82 (11th Cir.1986). Instead, to establish aiding and abetting liability, the government must prove that the defendant associated himself with the venture, participated in it as in something he wished to bring about, and sought by his actions to make it succeed. See United States v. Paone, 758 F.2d 774, 775 (1st Cir.1985); see also Trial Transcript, Vol. XII, at 33 (jury instruction to this effect). There is ample evidence in the record--for example, the fact that Rivera Ortiz had a stake in the venture--to justify the jury's decision to convict him on this count. Rivera Ortiz' conviction on count 12 is similarly immune from attack on sufficiency of the evidence grounds.
 
 
 34
 Rivera Ortiz' final sufficiency argument is that the importation counts (8, 9, and 10) are "incompatible" with the possession with intent to distribute counts (11 and 12) under the circumstances of this case because they are based on the same evidence (the $20,000 loan). This claim is meritless. There is no reason we are aware of why importation offenses and possession offenses prosecuted in one trial cannot be based on the same evidence, provided that the evidence in question is sufficient to establish the elements of the two offenses, see United States v. George, 752 F.2d 749, 755-56 (1st Cir.1985), which even Rivera Ortiz does not dispute are separate offenses for double jeopardy purposes.
 
 
 35
 Based on the foregoing analysis, we conclude that there was sufficient evidence to support Rivera Ortiz' convictions.
 
 
 36
 2. The factual background for the suppression claim is as follows.[4] Rivera Ortiz was arrested pursuant to a valid arrest warrant on August 13, 1986. Federal agents knocked on his door at 6 a.m. and arrested Rivera Ortiz as soon as he opened the door. The agents read him his Miranda rights and then asked him if he had any weapons. He replied that he had two legally registered weapons in the house, and requested his wife, Evelyn Rodriguez, to hand them over to the agents. One of the agents followed Rodriguez to the master bedroom, where she opened the first drawer of her dresser. There was an ashtray and a small wooden box in the drawer. The ashtray contained the butt of a marijuana cigarette, which Rodriguez immediately snatched and swallowed. She then tried to hide the box, but the federal agent seized it before she could do so. The agent then opened the box, which he testified was not heavy, in front of Rodriguez. Among other items, the box contained three plastic bags, each of which was filled with a powder which proved to be cocaine.[5] Because Rodriguez was unable to find the guns, Rivera Ortiz was brought up to find them, which he did.
 
 
 37
 Rivera Ortiz sought to suppress the fact that cocaine was found in his house when he was arrested on the grounds that the searches and seizure leading to the discovery of the cocaine violated the fourth amendment. The district court denied the motion to suppress the evidence, holding that the search was valid and that there was probable cause to justify the seizure. See Trial Transcript, Vol. XI, at 67-68.
 
 
 38
 Three separate incidents occurred for Fourth Amendment purposes: the search for the guns, the seizure of the box, and the search of the box. The threshold inquiry with respect to each incident is whether Rivera Ortiz has standing--whether the challenged searches and seizure violated his Fourth Amendment rights. See Rakas v. Illinois, 439 U.S. 128, 138-40, 99 S.Ct. 421, 427-28, 58 L.Ed.2d 387 (1978); United States v. McHugh, 769 F.2d 860, 864 (1st Cir.1985). As regards the search for the guns, it is indisputable that Rivera Ortiz has standing to challenge the search, because he had a legitimate expectation of privacy with respect to the house and the guns, both of which he owned and possessed.[6] Rivera Ortiz' challenge fails on the merits, however, because the district court found that he voluntarily consented to the agents accompanying his wife when she went to find the guns. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973). We therefore hold that the search for the guns did not violate Rivera Ortiz' Fourth Amendment rights.
 
 
 39
 Turning to the second incident, we find that Rivera Ortiz has standing to challenge the seizure of the box. Regardless of who owns it, the box was in a house owned and possessed by Rivera Ortiz. He has a right to challenge the seizure of items in his possession. See Alderman v. United States, 394 U.S. 165, 189, 89 S.Ct. 961, 975, 22 L.Ed.2d 176 (1969) (Harlan, J., concurring in part and dissenting in part). On the merits, however, we hold that the seizure was justified under the plain view doctrine. A plurality of the Supreme Court has identified three requirements to justify a seizure under the plain view doctrine. First, the police must lawfully make an initial intrusion or otherwise be in a position from which they can view a particular area. Second, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure. Third, the police must discover the incriminating evidence "inadvertently." See Arizona v. Hicks, 480 U.S. 321, 334, 107 S.Ct. 1149, 1157, 94 L.Ed.2d 347 (1987) (O'Connor, J., dissenting); Coolidge v. New Hampshire, 403 U.S. 443, 464-72, 91 S.Ct. 2022, 2037-38, 29 L.Ed.2d 564 (1971) (plurality opinion of Stewart, J.); Texas v. Brown, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540-41, 75 L.Ed.2d 502 (1983) (plurality opinion of Rehnquist, J.); see also United States v. Irizarry, 673 F.2d 554, 558-61 (1st Cir.1982).
 
 
 40
 The first requirement was met in this case because, as we have already held, the federal agents legitimately accompanied Rodriguez to the master bedroom. As regards the second requirement, the Supreme Court has indicated that there must be probable cause to support the conclusion that the items observed are evidence of a crime, contraband, or otherwise subject to seizure. See Hicks, 480 U.S. at 326, 107 S.Ct. at 1153. We affirm the district court's conclusion that there was probable cause to support the seizure. Probable cause is a "common sense standard" and requires only that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." See Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion) (citation omitted) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). Based on Rogriguez' swallowing of the marijuana cigarette and her almost simultaneous attempt to hide the box, the agent in question had probable cause to suspect that the box contained a controlled substance that Rodriguez would destroy unless the box was immediately seized. The third requirement, which is intended to prevent the use of the plain view doctrine as a pretense to avoid obtaining a warrant to seize evidence whose existence and location the police know in advance, see Brown, 460 U.S. at 743, 103 S.Ct. at 1543-44; Coolidge, 403 U.S. at 470, 91 S.Ct. at 2040, is also satisfied in this case. The agents went to Rivera Ortiz' house to execute a valid arrest warrant. There is no indication in the record that the agents knew that there were controlled substances in the defendant's house, or that they went to the house intending to seize those controlled substances. In fact, there is no evidence in the record that any charges were filed with respect to the seized cocaine.
 
 
 41
 We now move to the third incident, the search of the box. We hold that Rivera Ortiz has no standing to object to the search. Our conclusion is based on the fact that Rivera Ortiz failed to establish that he had a legitimate expectation of privacy with respect to the contents of the box. It is well settled that a criminal defendant has the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched and the items seized. See United States v. Aguirre, 839 F.2d 854, 856 (1st Cir.1988); McHugh, 769 F.2d at 864. During the suppression hearing, Rivera Ortiz never claimed that the box was his or explained why he had a subjective, let alone an objectively reasonable, expectation of privacy in its contents. It may well be that Rivera Ortiz had a reasonable expectation of privacy in the contents of the box, but if so, he failed to assert it at the suppression hearing. In fact, in his appellate brief, Rivera Ortiz goes out of his way to stress that the box was in his wife's dresser, which was in his wife's bedroom. See Brief for Appellant Rivera Ortiz at 15. Under these circumstances, we cannot overlook Rivera Ortiz' failure to assert an expectation of privacy in the contents of the box. We appreciate that Rivera Ortiz may have feared that any interest he claimed in the box at the suppression hearing would be used against him at trial, but it has been well settled for over twenty years that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence. See Simmons v. United States, 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968); see also United States v. Salvucci, 448 U.S. 83, 93-94 & n.9, 100 S.Ct. 2547, 2553-54 & n. 9, 65 L.Ed.2d 619 (1980) (leaving open the possibility that suppression testimony can be used for impeachment purposes). We also appreciate that Evelyn Rodriguez, Rivera Ortiz' wife, likely has standing to challenge the search of the box. The Supreme Court, however, has never recognized a derivative standing doctrine that would permit a husband to vicariously assert the Fourth Amendment rights of his wife. See W. LaFave, 4 Search and Seizure Sec. 11.3(i), at 362 & n.364 (2d ed.1987). Without explicit authorization from the Court, we are reluctant to independently establish such a doctrine. We hold that Rivera Ortiz has failed to meet his burden of proof with respect to establishing that he had a reasonable expectation of privacy in the contents of the box. See United States v. Lochan, 674 F.2d 960, 965 (1st Cir.1982). We express no opinion on the merits of the claim regarding the search of the box aside from noting that the validity of the box's seizure does not imply that the search of the box was valid. See Texas v. Brown, 460 U.S. 730, 747, 749, 103 S.Ct. 1535, 1546, 1547, 75 L.Ed.2d 502 (Stevens, J., concurring in the judgment); see also United States v. Chadwick, 433 U.S. 1, 11-16, 97 S.Ct. 2476, 2483-86, 53 L.Ed.2d 538 (1977) (holding that in the absence of exigent circumstances, the warrantless search of a container in police custody violates the Fourth Amendment despite the fact that the police had probable cause to search the container).
 
 
 42
 On the basis of the foregoing analysis, we affirm the district court's decision denying Rivera Ortiz' motion to suppress.
 
 
 43
 3. The suppression hearing was held after both the prosecution and the defense had presented their cases-in-chief.[7] The defense had called two witnesses, both lawyers, who testified that Rivera Ortiz had discussed the loan transaction with them. Based on those discussions, they testified, it appeared that the transaction was a bona fide loan and that Rivera Ortiz was unaware that the loan proceeds would be used to finance a drug importation scheme. After the district court denied Rivera Ortiz' motion to suppress, the prosecution sought to offer testimony regarding the seized cocaine to rebut the defense's 'innocent lender' theory. Rivera Ortiz' counsel objected to the admissibility of this evidence, arguing that it was impermissible character evidence that should be excluded under Rule 404(b) of the Federal Rules of Evidence. Alternatively, defense counsel argued that even if the evidence had legitimate probative value for purposes of Rule 404(b), that probative value was outweighed by the evidence's prejudicial impact, and that the evidence should therefore be excluded under Rule 403 of the Federal Rules of Evidence. The district court overruled these objections. It held that the subsequent act evidence was admissible under Rule 404(b) because it was offered to prove that Rivera Ortiz knew about drugs and that he was not an innocent lender. It also held that the probative value of the subsequent act evidence exceeded its prejudicial impact. See Trial Transcript, Vol. XI, at 99-100.
 
 
 44
 This Circuit is no stranger to the problems surrounding the admissibility of extrinsic act evidence. See, e.g., United States v. Fields, 871 F.2d 188, 195-99 (1st Cir.1989); United States v. Mateos Sanchez, 864 F.2d 232, 234-38 (1st Cir.1988); United States v. Oppon, 863 F.2d 141, 144-48 (1st Cir.1988). We have adopted a two-part test to resolve this issue. Oppon, 863 F.2d at 146. The first part of the test, applying Rule 404(b), determines whether the evidence in question was offered for any purpose other than solely to prove that the defendant had a propensity to commit the crime in question. If the first part of the test is satisfied, the focus shifts to the second part, which applies Rule 403 to determine whether the probative value of the evidence is outweighed by its prejudicial impact.
 
 
 45
 The government points out that the district court's determination that the subsequent bad act evidence had legitimate probative value is entitled to deference. See United States v. Griffin, 818 F.2d 97, 101 (1st Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). We find, however, that the district court abused its discretion in making this determination. The first reason offered by the district court to justify admission of the subsequent act evidence was to prove that Rivera Ortiz was involved with drugs. The court felt this evidence was necessary to counter the testimony of Rivera Ortiz' two witnesses, which the court felt conveyed the message that Rivera Ortiz "knew nothing about drugs." Trial Transcript, Vol. XI, at 94. We have reviewed the testimony of the two witnesses, see Trial Transcript, Vol. X, at 88-106, and conclude that neither one of these witnesses, directly or indirectly, implied that Rivera Ortiz had never possessed or used drugs. Instead, they testified that the loan transaction appeared to be legitimate based on the conversations that they had had regarding it with Rivera Ortiz. The defendant never put his knowledge of drugs at issue; admission of this evidence cannot be justified to rebut an issue that the defendant did not raise.[8]
 
 
 46
 The district court also admitted the subsequent extrinsic act evidence because it helped to prove that Rivera Ortiz knew that the drug proceeds were to be used for an illegal drug-related purpose. The court did not explain how this inference would be drawn. Presumably, it would be drawn through the following inferential chain. See United States v. Mann, 590 F.2d 361, 369 (1st Cir.1978) (advising courts to identify the relevancy relationship between the extrinsic act and the charged crime). First, the seized cocaine must be attributed to Rivera Ortiz. Second, the fact that Rivera Ortiz possessed cocaine in August 1986 must imply that Rivera Ortiz possessed or was familiar with cocaine in January 1985. Third, Rivera Ortiz' possession or familiarity with cocaine must imply that he would know why Panzardi sought to borrow money from him. The most glaring problem with this inferential chain is its second link. We fail to understand how the jury could make the inference that it requires--that possession of cocaine at one point in time implies possession of cocaine nineteen months earlier--without relying on an assessment of the defendant's character, which is exactly what Rule 404(b) is designed to prevent. See United States v. Rubio Estrada, 857 F.2d 845, 846 (1st Cir.1988). We do not imply that all subsequent act evidence is inadmissible under Rule 404(b). See United States v. Fields, 871 F.2d 188, 198 United States v. Masse, 816 F.2d 805, 813 (1st Cir.1987). Instead, we hold, based on the particular facts of this case, that the inference required by the second link cannot be drawn without reference to the defendant's character.
 
 
 47
 Even if the bad act in question had occurred prior to the incident for which Rivera Ortiz was charged, we think the inference required by the third link in the chain is so attenuated that this inferential chain cannot justify the admission of the subsequent act evidence under Rule 404(b). The argument that Rivera Ortiz is more likely to have known the purpose of the loan--to import large quantities of cocaine and heroin--because he possessed 99 mg. of cocaine in the past is rank speculation once propensity is set aside. To be admissible under Rule 404(b), there must be a tighter logical link between the extrinsic act and the charged crime. We repeat the caveat issued by our Chief Judge. "We urge the government and the district court to be careful as to the admission of [extrinsic act evidence]. While admissible in some circumstances, it is by no means a routine exercise and should not be accepted unless the government articulates with suitable precision the 'special' ground for doing so." United States v. Flores Perez, 849 F.2d 1, 8 (1st Cir.1988) (Campbell, C.J.); see United States v. Oppon, 863 F.2d 141, 149 (Coffin, J., concurring); United States v. Rubio Estrada, 857 F.2d 845, 856 (Torruella, J., dissenting); United States v. Simon, 842 F.2d 552, 556 (1st Cir.1988) (Torruella, J., concurring).
 
 
 48
 In any event, even if we were to assume, arguendo, that the evidence in question had some probative value for purposes of Rule 404(b), we have no doubt that the prejudicial impact of this evidence far outweighed its probative value. The government points out that the district court is entrusted with the balancing required by Rule 403, and that its determination will be reversed only in "exceptional circumstances." See United States v. Griffin, 818 F.2d 97, 101 (1st Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); accord United States v. Simon, 842 F.2d 552, 555 (1st Cir.1988). This case, however, presents just such circumstances. The prejudicial value of bad act evidence impugning the defendant's character is obvious. See Rubio Estrada, 857 F.2d at 851 (Torruella, J., dissenting). Its legitimate probative value, as we have explained above, is so attenuated that it is highly probable that the jury drew impermissible inferences from this evidence. Moreover, the prejudicial impact was unfair because the incremental value of this evidence was minimal; the government had other direct evidence to prove that Rivera Ortiz was aware of the purpose of the loan.[9] See United States v. Fields, 871 F.2d at 198 (approving the argument that extrinsic evidence should be excluded if a point is strongly supported by other evidence). It is true, as the government points out, that the district court instructed the jury to consider this evidence only as proof of Rivera Ortiz' knowledge with respect to the loan. See Trial Transcript, Vol. XI, at 111-12. But the prejudice in this case was so severe and unfair that it cannot be remedied merely through a limiting instruction. In fact, if limiting instructions could remedy all such errors, the government would easily be able to circumvent Rules 404(b) and 403. We hold that the admission of this evidence caused substantial unfair prejudice to the defendant and that it should therefore have been excluded under Rule 403. See United States v. Gonzalez Sanchez, 825 F.2d 572, 581 (1st Cir.), cert. denied sub nom. Latorre v. United States, --- U.S. ----, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987).
 
 
 49
 Having determined that the evidence should not have been admitted against Rivera Ortiz, we now examine whether this error was harmless, heeding the advice of Justice Rutledge. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). We have previously held that a nonconstitutional[10] evidentiary error under Rules 404(b) and 403 will be treated as harmless if it is "highly probable" that the error did not contribute to the verdict. See United States v. Gonzalez Sanchez, 825 F.2d 572, 580 (1st Cir.1987). Although the government's case against Rivera Ortiz was strong, we are unable to state, in good conscience, that it was so overwhelming that it was highly probable that the government would have prevailed even in the absence of the illegitimate boost that it received when the jury heard that cocaine had been found in Rivera Ortiz' house at the time of his arrest. Consequently, we hold that the error was not harmless, vacate Rivera Ortiz' convictions, and remand the case to the district court for retrial. Because of our disposition of this issue, we do not need to reach Rivera Ortiz' alternate contention that he is entitled to a new trial because his motion to sever was improperly denied.
 
 B. Jose Heredia Nieves (No. 87-1859)
 
 50
 Heredia was convicted on counts 1 and 11. He appeals his convictions on three grounds. First, he argues that his conviction on count 1 must be reversed because there is insufficient evidence in the record to support it. Second, he argues that both his convictions must be reversed because the trial court erroneously admitted into evidence proof of extrinsic acts that he had committed. Third, he argues that he should be resentenced because his sentence is excessive, inconsistent, and based on facts that should not have been considered.
 
 
 51
 1. There are two parts to the sufficiency of the evidence argument with respect to count 1. Heredia argues that the government failed to prove the conspiracy that it charged in the indictment, and alternatively, that even if it did prove the charged conspiracy, the government failed to prove that he had joined it. We address each part in turn.
 
 
 52
 Heredia apparently argues that although the government charged one conspiracy, the proof that it offered at trial actually proved several different, disconnected, and smaller conspiracies. The variance between the indictment and the proof was so prejudicial that it mandates the reversal of his conviction on count 1. See Kotteakos v. United States, 328 U.S. 750, 757, 766, 66 S.Ct. 1239, 1243, 1248, 90 L.Ed. 1557 (1946). The question whether there is one conspiracy or many conspiracies is an issue of fact for the jury to decide.[11] See United States v. Rivera-Santiago, 872 F.2d 1073, at 1079 (1st Cir.1989). "A single conspiracy is proved if the evidence sufficiently shows 'that all of the alleged conspirators directed their efforts towards the accomplishment of a common goal or overall plan'." Id. (quoting United States v. Drougas, 748 F.2d 8, 17 (1st Cir.1984)). There is more than sufficient evidence in this record to allow the jury to find, beyond a reasonable doubt, that a single conspiracy existed. Panzardi's testimony alone, if believed by the jury, proved that there was an ongoing agreement to possess and distribute illegal drugs. To be sure, the peripheral players changed during the course of the conspiracy, but the central characters remained the same. "The fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement does not transform a continuing plan into multiple conspiracies." Drougas, 748 F.2d at 17. There is sufficient evidence to support a finding that the peripheral players knew of the existence of the ongoing agreement and of the existence and role of other peripheral players. We therefore reject the variance argument.
 
 
 53
 Heredia also argues that there was insufficient evidence to prove that he was a member of the charged conspiracy. All the evidence proves, the appellant argues, is that Panzardi and he had a buyer-seller relationship. The mere existence of such a relationship does not prove that he was a member of the conspiracy absent independent evidence of knowledge of the conspiracy, his intent to join it and to further its aims. The government concedes that in this Circuit, proof of a single, isolated purchase of drugs will not, per se, support an inference that the buyer had knowledge of, or acquiesced in, a larger conspiratorial scheme. See United States v. DeLutis, 722 F.2d 902, 905-07 (1st Cir.1983). But, the government argues, this "isolated transaction" doctrine is of no value to Heredia because he was not a mere one-time buyer, and because the nature of his transactions with Panzardi indicate that he had knowledge of the broader conspiracy. See id. at 906. Heredia was a drug wholesaler who purchased a substantial quantity of heroin from Panzardi. He was initially given a sample package, which Panzardi guaranteed could be "cut" twice. See Trial Transcript, Vol. IV, at 88. It was only after testing the sample that Heredia agreed to purchase one-eighth of a kilogram of heroin for $50,000. He paid about one-half of the purchase price in cash upon taking delivery, and paid the balance two or three days later. He also purchased another one-eighth kilogram of heroin, which was apparently paid for after it was sold. Heredia then purchased yet another one-eighth kilogram of heroin. This package, however, was later returned to Panzardi because Heredia was dissatisfied with its quality relative to the other heroin that was available to him. See Trial Transcript, Vol. IV, at 92-94. Based on the size and frequency of his purchases, the jury could reasonably have concluded that Heredia was aware that a large drug shipment had arrived, and that Heredia was a knowing participant in the scheme to distribute that shipment. There was sufficient indirect evidence to support a finding that Heredia knew of the broader conspiracy, intended to join it, and intended to further its aims. See United States v. Bobo, 586 F.2d 355, 370 n. 20 (5th Cir.1978), cert. denied sub nom. Rowan v. United States, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); United States v. Mangano, 543 F.2d 431, 435 & n. 1 (2d Cir.1976), cert. denied, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977). We therefore reject the claim that there was insufficient evidence to support his conviction on count 1.
 
 
 54
 2. The factual background for the extrinsic acts claim is as follows. During the prosecutor's examination of Panzardi and Nieves, both the prosecutor and the witnesses, while discussing Heredia, occasionally referred to him as "Guillo el Perro" and occasionally as "Checo el Perro." In his defense, Heredia called only one witness, who testified that Heredia was known as "Checo el Perro," but that he had a brother, Guillermo, who was known as "Guillo el Perro." See Trial Transcript, Vol. X, at 111-12. To rebut the inference that Heredia was not the individual that Panzardi and Nieves had implicated, the prosecutor sought to introduce testimony from a convicted drug trafficker that in March 1985 he had delivered a seven-gram sample of cocaine to Heredia, whom he called "Checo el Perro," and that they had thereafter engaged in a five kilogram transaction. Heredia objected to the introduction of this prior bad act evidence under Rule 404(b) and 403 of the Federal Rules of Evidence. See id., Vol. XI, at 83-87. The trial court overruled his objection, holding that Heredia had raised identity as a defense and that the evidence was relevant to rebut that defense, pointing to the distinct similarities between the manner in which the extrinsic act and the act forming the subject matter of the offense charged were committed. See id. at 95-99. The court then decided that the probative value of the proposed evidence exceeded its prejudicial impact, see id. at 100, and admitted the evidence into the record. The court also instructed the jury that the rebuttal testimony was being admitted only to prove identity, not to prove that Heredia committed the crimes charged in the indictment. See id. at 111-12.
 
 
 55
 We have already described this Circuit's two-part test for reviewing the admission into evidence of extrinsic act evidence. See supra at 220. The district court determined that the first part of the test was satisfied because the defense's case-in-chief raised the issue of identity.[12] The prior extrinsic act was admissible to rebut that testimony by establishing the defendant's identity through the similarity between the modus operandi of the prior act and the charged act.[13] As far as we can tell, the only similarity is that the seller in both instances offered the buyer a sample of the illegal drug before consummating a sale of the drug in a wholesale quantity. This explanation falls far short of justifying the admission of this evidence under Rule 404(b). To qualify for the identity/modus operandi exception, the extrinsic act must be "so unusual and distinctive as to be like a signature." J. McCormick, Evidence Sec. 157 (1954) (quoted in Weinstein's Evidence p 404 at 127-28). We have previously required the common presence of "some highly distinctive quality." United States v. Pisari, 636 F.2d 855, 859 (1st Cir.1981); accord United States v. Ingraham, 832 F.2d 229, 232-33 (1st Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); see United States v. Lail, 846 F.2d 1299, 1301 (11th Cir.1988); United States v. Neary, 733 F.2d 210, 216 (2d Cir.1984); United States v. Silva, 580 F.2d 144, 148 (5th Cir.1978). The exchange of a sample prior to a sale of drugs in wholesale quantities does not strike us as unusual, let alone highly distinctive. This prosaic commonality cannot give rise to an inference that the same person was involved in both acts without reference to propensity. See id. To prevent the exception from swallowing the rule, we hold that Rule 404(b) cannot justify the admission of this prior extrinsic act evidence.
 
 
 56
 We now determine whether the admission of this evidence was harmless error. Although the government had built a strong case through the testimony of Panzardi and Nieves, we are unable to state that it was so overwhelming that it was highly probable that the admission of this evidence did not contribute to the verdict. Despite the limiting instruction, the fact that Heredia had purchased five kilograms of cocaine only a month before the substantive transaction with which he was charged is likely to have significantly influenced the jury, and compromised Heredia's right to be judged on the basis of what actually happened on this particular occasion. See Pisari, 636 F.2d at 859-60. Consequently, we hold that the error was not harmless, vacate Heredia's convictions, and remand the case to the district court for a new trial. Because of our disposition of this issue, we do not reach Heredia's remaining contention regarding sentencing.
 
 C. Blanca Garcia Rosa (No. 87-1625)
 
 57
 Garcia was convicted on counts 1 and 11. She appeals her convictions on the following grounds. First, she argues that there was insufficient evidence to support her conviction on count 1. Second, she argues that her conviction should be reversed because it was based solely on the testimony of Panzardi and Nieves, which she claims is completely unreliable. Third, she argues that she is entitled to a new trial because the judge refused to give the jury an instruction that she had proposed.
 
 
 58
 1. Garcia makes two arguments with respect to the sufficiency of the evidence for her conviction under count 1, conspiracy to possess heroin and cocaine with intent to distribute. First, she concedes that she assisted in the packaging of the drugs imported in the second shipment, but argues that this conduct is insufficient to prove that she joined the conspiracy. It is true that the government did not offer any direct evidence proving that Garcia joined the conspiracy, but it is well settled that the government may satisfy its burden of proof through circumstantial evidence. See United States v. Delgado Figueroa, 832 F.2d 691, 695 (1st Cir.1987). We hold that the government offered sufficient circumstantial evidence to justify the verdict on count 1. The government showed that Garcia's apartment was used on numerous occasions by large groups of people, using an assembly line operation, to package heroin into small bags for retail sale. The government also showed that Garcia was one of the packagers. From this evidence, the jury could conclude that Garcia was aware of the conspiracy, intended to join it, and intended to carry out the objectives of the conspiracy. See id. at 694-95; United States v. Flaherty, 668 F.2d 566, 580 (1st Cir.1981).
 
 
 59
 Second, Garcia argues that she played absolutely no role in the first shipment, and that there is therefore no evidence to find her guilty of conspiracy with respect to that shipment. The government responds that there is only one conspiracy,[14] that Garcia joined it, and that she is liable for all phases of the agreement, even those that were consummated before she joined the conspiracy. We have already held above that there was sufficient evidence to support the jury's verdict that Garcia was a member of the conspiracy. This Circuit has previously held that a conspirator is liable for the acts of coconspirators committed before the conspirator joined the conspiracy. See United States v. Baines, 812 F.2d 41, 42 (1st Cir.1987). "[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight--or conduct--regardless of whether he is aware of just what it is composed." Id. at 42; accord United States v. Reynolds, 828 F.2d 46, 47-48 (1st Cir.1987). Consequently, we reject Garcia's argument that she cannot be liable for conspiracy with respect to the first shipment because she was not personally involved in that phase of the conspiracy or because she joined the conspiracy after the first shipment had been distributed.
 
 
 60
 2. Garcia argues that her convictions must be reversed because they are based solely on the testimony of Panzardi and Nieves, who have been convicted of crime and have committed perjury on numerous occasions in the past. Because Garcia does not allege any specific act of perjury in the testimony of either Panzardi or Nieves, or allege that the government prevented her from attacking their credibility, this argument amounts to nothing more than the meritless claim that the jury should not have believed Panzardi and Nieves. Assessing the credibility of witnesses is the province of the jury. See United States v. Guerrero-Guerrero, 776 F.2d 1071, 1073 (1st Cir.1985), cert. denied sub nom. Mosquera v. United States, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986); United States v. Pinalto, 771 F.2d 457, 459 (10th Cir.1985). We will not disturb the jury's assessment if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). We have already held that this standard was met with respect to count 1, and we now hold, for similar reasons, that it was also met with respect to count 11.
 
 
 61
 3. The trial court refused to instruct the jury, as requested by Garcia, that it had the power to return inconsistent verdicts or to return a verdict of acquittal even if it found the defendant guilty. Garcia claims that this omission contravenes United States v. Corsino, 812 F.2d 26, 32 (1st Cir.1987), and entitles her to a new trial. We disagree. In Corsino, we merely held that a jury has the prerogative to return inconsistent verdicts and to acquit out of leniency. Our opinion does not imply that a defendant has the right to require the judge to instruct the jury that it has such power. In fact, we explicitly held to the contrary in United States v. Boardman, 419 F.2d 110, 116 (1st Cir.1969), cert. denied, 397 U.S. 991, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). "[J]urors may have the power to ignore the law, but their duty is to apply the law as interpreted by the court, and they should be so instructed." Id. at 116. Our Boardman position is consistent with that of every other federal appellate court that has addressed this issue. See United States v. Trujillo, 714 F.2d 102, 105-06 (11th Cir.1983) (listing cases). Corsino was not intended to and does not undercut Boardman.
 
 
 62
 Blanca Garcia Rosa's convictions on counts 1 and 11 are affirmed.
 
 D. Pedro Soto Alvarez (No. 87-1626)
 
 63
 Soto was convicted on counts 1 through 6. He appeals these convictions on a number of grounds. First, he argues that his convictions on count 1 and counts 2 through 5 violated rights afforded to him by the Double Jeopardy Clause of the Fifth Amendment. Second, he argues that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment. Third, he alleges that the indictment and his convictions should have been dismissed because both were based on the testimony of admitted perjurers. Fourth, he alleges prosecutorial misconduct. Fifth, he argues that the district court committed numerous errors during the trial.
 
 
 64
 1. Soto makes three double jeopardy claims. The first relates to his conviction on count 1, the second to his conviction on counts 2-5, and the third to his conviction on count 6. We discuss the claim with respect to count 1 first. Soto had been charged with seven drug-related counts in a previous indictment issued in April 1985. The first count of that indictment charged him with conspiracy to possess cocaine with intent to distribute; the second and fourth counts charged him with possession of cocaine with intent to distribute; the third and fifth counts charged him with distribution of cocaine; the sixth and seventh counts charged him with illegal use of a communications facility. As regards the first count, Soto was charged with conspiring with Hector Nevarez Tubens ("Nevarez") and other persons unknown to the Grand Jury, for the one week period between September 20 and September 27, 1984. The indictment stemmed from the sale of 153 grams of cocaine to an undercover officer. Pursuant to a plea agreement, Soto pled guilty at trial to the conspiracy count and one of the illegal uses of a communications facility counts. Charges on the other counts were dropped. Soto was sentenced to eight years in prison. He was serving that sentence when the indictment that began this case was issued. Soto argues that his conviction on the prior conspiracy charge precludes his conviction on count 1 in this case.[15]
 
 
 65
 The Double Jeopardy Clause of the Fifth Amendment guarantees defendants, inter alia, that they will not be reprosecuted for the same offense after conviction. See North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The primary test for determining whether two offenses are the "same" for double jeopardy purposes was described in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This test applies when the defendant is charged with the violation of two distinct statutory provisions. It focuses on the elements of each provision and inquires "whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); see Brown v. Ohio, 432 U.S. 161 at 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). This test is inapplicable here, however, because Soto was charged twice with violation of the same statutory provision, 21 U.S.C. Sec. 846.
 
 
 66
 Even when the Blockburger test is satisfied, however, there is precedent supporting the proposition that under certain exceptional circumstances, evidence adduced at an earlier trial which is reintroduced at a subsequent trial may give rise to double jeopardy problems. See Brown, 432 U.S. at 166 & n. 6, 97 S.Ct. at 2225 & n. 6; Jordan v. Virginia, 653 F.2d 870, 873 (4th Cir.1980); United States v. Sabella, 272 F.2d 206 (2d Cir.1959) (Friendly, J.); see also Davis v. Herring, 800 F.2d 513, 518 (5th Cir.1986); United States v. Black, 759 F.2d 71, 73 (D.C.Cir.1985) (per curiam) (acknowledging such precedent). These concerns are usually addressed by the "same evidence" test, which focuses on the proof actually used to establish each violation. The second prosecution will be barred if the evidence actually used to prosecute the first offense would suffice to convict the defendant of the second offense as charged. See Ashe v. Swenson, 397 U.S. 436, 451-53, 90 S.Ct. 1189, 1197-1198, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring); In re Neilsen, 131 U.S. 176, 188, 9 S.Ct. 672, 676, 33 L.Ed. 118 (1889); United States v. Ragins, 840 F.2d 1184, 1188 (4th Cir.1988).
 
 
 67
 Regardless of the appropriate scope of the "same evidence" test when a defendant is successively charged with violation of different statutory provisions,[16] there is no doubt that this test (or variations of it) have regularly been used to resolve double jeopardy claims by defendants successively charged with violation of the same statutory provision, particularly with respect to conspiracy prosecutions. See United States v. Allen, 539 F.Supp. 296, 304 (C.D.Cal.1982) (citing cases); see, e.g., United States v. Reiter, 848 F.2d 336, 340 (2d Cir.1988). In practice, the same evidence test is usually modified when applied to conspiracy cases. Because of the "ease with which prosecutors can draft indictments that allege what may appear to be separate conspiracies but may actually be parts of an overall conspiracy," United States v. Abbamonte, 759 F.2d 1065, 1068 (2d Cir.1985), a majority of federal appellate courts have adopted a multi-pronged totality of the circumstances test to determine whether two successive counts charge the same offense for purposes of double jeopardy. See United States v. Liotard, 817 F.2d 1074, 1078 (3rd Cir.1987) (citing cases); see also United States v. Broce, --- U.S. ----, 109 S.Ct. 757, 770 n. 2, 102 L.Ed.2d 927 (1989) (Blackmun, J., dissenting) (discussing the factors that are examined). This court considers five factors in deciding whether two charged conspiracies are actually the same for double jeopardy purposes: (a) the time during which the activities occurred; (b) the persons involved in the two conspiracies; (c) the places involved; (d) whether the same evidence was used to prove the two conspiracies; (e) whether the same statutory provision was involved in both conspiracies. See United States v. Booth, 673 F.2d 27, 29 (1st Cir.), cert. denied, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). We now apply this test to the facts of this case.
 
 
 68
 As regards the first factor, there is complete overlap between the two conspiracies. The conspiracy to which Soto pled guilty (the "narrow" conspiracy) occurred during the twenty-three month period during which the conspiracy charged in count 1 (the "broad" conspiracy) existed. This factor favors the defendant's claim.
 
 
 69
 As regards the second factor, Soto and Nevarez were charged in both conspiracies. They were the only known conspirators in the narrow conspiracy, whereas there were twenty-nine other persons charged in the broad conspiracy. Soto was a central character in both conspiracies. The overlap in personnel is striking. The presence of other unknown conspirators in the narrow conspiracy and named conspirators in the broad conspiracy does not undercut the strong suggestion that the narrow conspiracy was merely a "portion" of the broad conspiracy. See United States v. Levy, 803 F.2d 1390, 1395 (5th Cir.1986) (Wisdom, J.).
 
 
 70
 As regards the third factor, both conspiracies appear to have been carried out primarily in Puerto Rico. Consequently, this factor also favors the defendant's claim.
 
 
 71
 As regards the fourth factor, the government claimed that one of the overt acts in furtherance of the broad conspiracy was the distribution by Soto, Nevarez, and Rivera Feliciano of heroin and cocaine obtained in the first shipment. See Indictment at 5, reproduced in Appendix to Brief of Appellant Eduardo Rivera Ortiz at A-49. The government introduced evidence of acts in furtherance of the narrow conspiracy during the trial in this case, specifically the sale of cocaine by Nevarez and Soto to an undercover agent. See Trial Transcript, Vol. VI, at 137-41 (testimony of Agent Arturo Roman). We assume that this evidence was introduced to prove the overt act charged in the subsequent indictment. It is possible that the evidence was introduced for some other reason, see Booth, 673 F.2d at 30, but the record does not indicate what it might be, and the government itself has offered no alternative explanation. Consequently, this factor strongly favors the defendant's claim.
 
 
 72
 As regards the fifth factor, both conspiracies alleged violations of 21 U.S.C. Sec. 841(a)(1). The narrow conspiracy charged possession of cocaine with intent to distribute, whereas the broad conspiracy charged possession of both cocaine and heroin with intent to distribute. This factor also suggests that the narrow conspiracy was merely a phase of the broad conspiracy, and therefore favors the defendant's claim.
 
 
 73
 Despite the fact that each of these five factors favors the defendant, the government argues that the two conspiracies are not the same for double jeopardy purposes because the narrow conspiracy stems from a single transaction that occurred months after the arrival of the first shipment of the broad conspiracy and months before the arrival of the second shipment of the broad conspiracy. The government concedes that it is possible that the drugs sold as part of the narrow conspiracy came from the first shipment alleged in the broad conspiracy, but argues that the defendant bears the burden of proving a nonfrivolous double jeopardy claim, which burden the defendant has not met in this case.
 
 
 74
 We cannot agree with the government's position. The defendant has demonstrated beyond mere speculation that the broad conspiracy subsumed the narrow conspiracy in terms of objective, location, timing and parties involved. Furthermore, the government used acts in furtherance of the narrow conspiracy to prove the existence of the broad conspiracy. We hold that the defendant has established a nonfrivolous prima facie claim. See Levy, 803 F.2d at 1396; United States v. Abbamonte, 759 F.2d 1065, 1070 (2d Cir.1985).
 
 
 75
 Once the defendant has established a nonfrivolous double jeopardy claim, the burden of persuasion shifts to the government to demonstrate by a preponderance of the evidence that the indictments actually charge separate offenses. See Booth, 673 F.2d at 30-31. This position is consistent with that of every other federal appellate court that has considered the issue. See United States v. Ragins, 840 F.2d 1184, 1192 (4th Cir.1988) (citing cases).[17] The government has failed to meet its burden of proof in this case. It has adduced absolutely no evidence to prove that the narrow conspiracy was more than just one distribution phase of the broad conspiracy. There is no basis in the record to believe that Soto and Nevarez had an independent organization, separate financing, or a different source of drugs. See Abbamonte, 759 F.2d at 1069-70; United States v. Mallah, 503 F.2d 971, 986 (2d Cir.1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). Consequently, we hold that the two conspiracies are the "same" offense for double jeopardy purposes, and therefore that Soto Alvarez' conviction on count 1 must be reversed.
 
 
 76
 We wish to make two additional points regarding this issue. First, we do not imply that one conspiracy conviction gives an individual automatic immunity from subsequent prosecution for a second conspiracy that overlaps the first in terms of duration, personnel, purpose, and location. See United States v. Adamo, 742 F.2d 927, 947 (6th Cir.1984). We simply hold that the government has not shown that the two conspiracies in this case were sufficiently distinct for double jeopardy purposes.[18] Second, we recognize that the government bears a difficult burden in proving that the two conspiracies are distinct. The government's predicament, however, is of its own making, stemming from its decision to bring charges against Soto in April 1985. See id.; Abbamonte, 759 F.2d at 1070.
 
 
 77
 Soto's second double jeopardy claim is that he cannot be convicted for importation of both heroin and cocaine, and for possession with intent to distribute both heroin and cocaine. He argues that his convictions on either one of the importation counts (2 or 3) and on either one of the possession with intent to distribute counts (4 or 5) must be reversed on double jeopardy grounds. We reject this argument because it is plainly incorrect as a matter of law. This Circuit has already decided that the imposition of consecutive sentences for the simultaneous possession of a Schedule I (heroin) and a Schedule II (cocaine) drug with intent to distribute is neither barred by the Double Jeopardy Clause nor inconsistent with congressional intent. See United States v. Bonilla Romero, 836 F.2d 39, 46-47 (1st Cir.1987), cert. denied, --- U.S. ----, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988).
 
 
 78
 Soto's third double jeopardy claim is that his conviction on count 6 (violation of the Travel Act) is multiplicitous because it charges the same offense as does the conspiracy count. We reject this claim under Blockburger because each provision requires proof of a fact which the other does not. The Travel Act, 18 U.S.C. Sec. 1952, requires proof of travel in interstate commerce plus the carrying on of some act toward carrying on the underlying illegal activity. See United States v. Teplin, 775 F.2d 1261, 1265 (4th Cir.1985). It does not require proof that the underlying illegal activity (for example, importation) actually amounted to violation of a criminal statute. See United States v. Pomponio, 511 F.2d 953, 957 (4th Cir.), cert. denied, 423 U.S. 874, 96 S.Ct. 142, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975). Conspiracy, on the other hand, requires proof of three elements: existence of an agreement to achieve an unlawful objective, intent to enter into that agreement, and intent to carry out the unlawful objective. See United States v. Flaherty, 668 F.2d 566, 580-81 (1st Cir.1981). Thus violation of the Travel Act is not the same offense as conspiracy for purposes of the Blockburger test. As we have already stated, the fact that the same evidence was used in one trial to prove the distinct elements of both offenses does not cause any double jeopardy problems.
 
 
 79
 2. Soto recites a litany of incidents which he claims demonstrate that he was denied his right to effective assistance of counsel guaranteed by the Sixth Amendment. He had insufficient time to consult with his attorney; his attorney had a conflict of interest because he had previously represented Panzardi's brother in a separate proceeding; his attorney failed to object to Agent Arturo Roman's testimony, to cross-examine Roman effectively, or to request curative instructions regarding that testimony; his attorney cross-examined Panzardi improperly; his attorney failed to object to prejudicial remarks in the prosecutor's closing argument.
 
 
 80
 In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-part test to determine whether counsel's assistance was so ineffective as to require reversal of a defendant's conviction. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. Id. at 687, 104 S.Ct. at 2064. The Court has indicated that judicial scrutiny of counsel's performance must be "highly deferential." Id. at 689, 104 S.Ct. at 2065. "[A] court must indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.
 
 
 81
 We first address the insufficient time to confer argument. The defendant was brought back to Puerto Rico one week before trial. During that week, he was able to meet three times with his trial counsel, who had been appointed eight months before. He sought a thirty day continuance to allow him to consult with his attorney and prepare for trial. See Trial Transcript, Vol. II, at 9. The request was denied. See id. at 17. Soto argues that this decision denied him the effective assistance of counsel. The problem with the argument is that Soto has not explained how his attorney's actual performance was diminished by the trial court's denial of his motion for a continuance. The argument therefore fails to satisfy the first prong of the Washington test. See Casale v. Fair, 833 F.2d 386, 391 (1st Cir.1987); Therrien v. Vose, 782 F.2d 1, 3 (1st Cir.), cert. denied, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 727 (1986).
 
 
 82
 Soto next argues that his counsel had a conflict of interest because he had previously represented the brother of the chief prosecution witness, Panzardi. Because of this conflict, counsel did not call Panzardi's brother as a witness to discredit Panzardi. The two-part Washington test is modified when the ineffectiveness claim is based on a conflict of interest. See Washington, 466 U.S. at 692, 104 S.Ct. at 2067. Prejudice is presumed when counsel is burdened by an actual conflict of interest. Id.; Cuyler v. Sullivan, 446 U.S. 335, 349-50, 100 S.Ct. 1708, 1718-19, 64 L.Ed.2d 333 (1980). We have previously held that a defendant must prove two elements to establish an actual conflict of interest. See United States v. Fahey, 769 F.2d 829, 836 (1st Cir.1985); Brien v. United States, 695 F.2d 10, 15 (1st Cir.1982). First, he must demonstrate that some plausible alternative defense strategy might have been pursued. He need not show that the alternative strategy would have been successful, but that it possessed "sufficient substance" to be a "viable alternative." Brien, 695 F.2d at 15. Second, he must show that this alternative strategy was not pursued because of the attorney's other loyalties or interests.
 
 
 83
 Soto's claim does not satisfy the first part of this test. He baldly asserts that Panzardi's brother would have testified that Soto was not part of Panzardi's drug importation schemes, but provides no substantiation for this assertion. He does not explain why Panzardi's brother would be familiar with Panzardi's illegal schemes, and even if he was familiar with them, how his testimony would contradict that of Panzardi. If the brother did have knowledge that could be used to impeach Panzardi,[19] Soto does not explain why the other defendants, who had independent counsel, did not call the brother as a witness. See Brien, 695 F.2d at 16. Perhaps the other defendants did not call Panzardi's brother as a witness because his testimony would have absolved only Soto, but we are unwilling to engage in such speculation on the basis of Soto's conclusory allegations. We hold that Soto has not shown that this alternative strategy had "sufficient substance" to be a "viable alternative."
 
 
 84
 Soto's claim also does not satisfy the second part of the actual conflict test stated in Fahey and Brien. Soto claims that his counsel had represented Panzardi's brother in the past. There is no indication that counsel continued to represent the brother during Soto's trial. Soto does not explain why the past representation would prevent counsel from calling Panzardi's brother as a witness. Because of the lack of specificity in Soto's arguments, we are not convinced that the conflict is "real"; instead, it appears to be based on an "attenuated hypothesis." See Fahey, 769 F.2d at 835. Soto has not established grounds for us to find that counsel did not call Panzardi's brother as a witness because of a conflict of interest.
 
 
 85
 We next consider the arguments with respect to the testimony of Arturo Roman. Agent Roman testified that Soto and Nevarez had tried to sell him cocaine, and that Soto had told him that he had gone to South America to purchase illegal drugs. See Trial Transcript, Vol. VI, at 137-42. Soto argues that his counsel should have objected to the admissibility of this testimony, should have cross-examined Roman more extensively, and should have sought a curative instruction. Since the testimony was admissible under Rule 801(d)(2)(A) of the Federal Rules of Evidence, counsel was under no obligation to make a futile objection to its admissibility. See United States v. Talavera, 668 F.2d 625, 632 (1st Cir.), cert. denied sub nom. Pena v. United States, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). The latter two claims pertain to trial tactics. Based on the record, we cannot say that counsel's tactical decisions were not competent. The defendant has not adduced sufficient evidence to overcome the presumption that his counsel acted reasonably. See id. The claims relating to Roman's testimony must be rejected because they fail to satisfy the first part of the Washington test.
 
 
 86
 The remaining claims--improper cross-examination and failure to object to closing argument--are also matters of trial tactics. We have carefully considered Soto's arguments in light of the record and find that he has not overcome the presumption that his counsel acted reasonably. See id. Consequently, these claims also fail to satisfy the first part of the Washington test.
 
 
 87
 Based on the foregoing analysis, we reject the claim that Soto was denied effective assistance of counsel as guaranteed by the Sixth Amendment.
 
 
 88
 3. Soto argues that his indictment should have been dismissed because it was based on the grand jury testimony of Panzardi and Nieves, both of whom have admitted to committing perjury in the past. "There is no valid reason to believe that a witness who had lied on so many occasions to the court, and to juries would all of a sudden turn truthful to a Grand Jury." Brief of Appellant Pedro Soto Alvarez at 21. He also claims that his convictions should be reversed because they were based primarily on the trial testimony of Panzardi and Nieves. We reject both arguments.
 
 
 89
 Soto does not claim that the indictment was invalid on its face. Consequently, the indictment cannot be challenged on the ground that it was based on incompetent or inadequate evidence. See United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Soto nevertheless argues that his indictment should be dismissed under the rule announced in United States v. Basurto, 497 F.2d 781 (9th Cir.1974). A defendant may not be forced to stand trial based "on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached." Id. at 785. This court has not adopted the Basurto rule. See United States v. Maceo, 873 F.2d 1, 3 (1st Cir.1989). Even if it had, Soto Alvarez could not benefit from the rule because he has not proven that any particular testimony was perjured, let alone that the government knew that it was perjured. See United States v. Rivera-Santiago, 872 F.2d 1073, 1088-89. We hold that the district court correctly refused to dismiss the indictment.
 
 
 90
 We reject Soto's challenge to his petit jury convictions for the same reasons that we rejected an identical challenge by Rosa Garcia. See supra at 226.
 
 
 91
 4. In his pro se brief, Soto cites numerous instances of prosecutorial misconduct. We have considered them carefully and have concluded that none of them are actionable. We discuss only the most meritorious of these claims here: prosecutorial vindictiveness, Brady violations, and misstatements in the closing argument.
 
 
 92
 Soto claims that he was indicted a second time because he refused to cooperate with federal prosecutors in other criminal proceedings following his guilty plea to some of the charges in the first indictment. A defendant may demonstrate vindictiveness in two ways. First, he can produce evidence of actual vindictiveness sufficient to establish a due process violation. Second, a defendant can convince a court that the circumstances show that there is a sufficient "likelihood of vindictiveness" to warrant a presumption of vindictiveness. See United States v. Marrapese, 826 F.2d 145, 147 (1st Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). The first option is closed to Soto because he has not adduced any evidence to support his bare allegation of vindictiveness. The second option is equally unavailing. Soto has made no effort to explain why these circumstances--the issuance of a second indictment against a defendant who has entered into a plea bargain on the first indictment but has refused to cooperate with prosecutors in other cases--warrant a presumption of vindictiveness. If anything, the fact that the prosecution was willing to plea bargain on the charges in the first indictment belies the claim of vindictiveness. Even if a presumption was justified in such circumstances, the actual facts of this case would rebut such a presumption. The first indictment was apparently issued before the completion of an extensive undercover investigation. After the investigation was completed, a more comprehensive indictment was issued against Soto and thirty other conspirators. These facts do not corroborate the claim that the second indictment was issued to retaliate against Soto because of his unwillingness to cooperate with prosecutors.
 
 
 93
 Soto claims that the prosecution withheld exculpatory Brady material (the most important item being Soto's passport) from the defense before trial. Had this material been available to the defense, Soto argues that "perhaps" the jury might have rendered a different verdict. Pro Se Brief of Appellant Pedro Soto Alvarez at 4. The government correctly points out that the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), only applies to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense. See United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). In this case, the passport was introduced into evidence as a trial exhibit by the government, and the Brady rule is therefore inapplicable. The defendant also requests us to invoke our supervisory power to remedy this instance of prosecutorial misconduct. See United States v. Hasting, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983); United States v. Payner, 447 U.S. 727, 735-36, 100 S.Ct. 2439, 2446-47, 65 L.Ed.2d 468 (1980). Even assuming that there was misconduct, and that misconduct of this type can be remedied through the use of our supervisory power, the exercise of that power in this case would be inappropriate because the error appears to have been harmless. See Hasting, 461 U.S. at 506, 103 S.Ct. at 1979. Soto Alvarez has not explained specifically how the delay in obtaining the passport and other items prejudiced his defense, let alone how it affected the verdict.
 
 
 94
 Soto also argues now that the prosecutors falsely stated during their closing arguments that Panzardi and Soto's passports indicated that they had made the same trips in January 1984. Because no contemporaneous objection was made to this remark, we review it under a plain error standard. See United States v. Young, 470 U.S. 1, 14-20, 105 S.Ct. 1038, 1045-49, 84 L.Ed.2d 1; United States v. Glantz, 810 F.2d 316, 324 (1st Cir.), cert. denied, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). We are unable to determine whether the remark was indeed false. Even if it was, we are convinced that the remark did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Glantz, 810 F.2d at 324. Soto's passport had been introduced into evidence as a trial exhibit. His attorney had ample opportunity during the trial to contest the claim that Panzardi and Soto had travelled together at the time in question. The failure to take advantage of that opportunity cannot retroactively be remedied through claims of prosecutorial misconduct.
 
 
 95
 5. Soto argues that the trial court committed the following prejudicial errors.[20] First, the trial court stated that Soto Alvarez owned drugs in the presence of the jury. Second, the trial court failed to give cautionary instructions regarding hearsay testimony. Third, the trial court failed to mention "foreign commerce" in its instructions on the elements of count 6 (travel in interstate and foreign commerce in violation of 18 U.S.C. Sec. 1952).
 
 
 96
 We summarily reject the first claim because it is based on a misreading of the record. The trial court never stated that Soto Alvarez owned drugs in the presence of the jury. That remark was made by the witness, Arturo Roman. See Trial Transcript, Vol. VI, at 138, lines 16-18.
 
 
 97
 The second claim is difficult to follow. As best as we can understand it, the argument is that the trial court erred in admitting hearsay testimony by Arturo Roman without giving the jury a limiting instruction. The argument is based upon United States v. Honneus, 508 F.2d 566 (1st Cir.1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). The testimony in question described statements made by Soto to Roman to the effect that the former had just returned from South America with three kilograms of heroin. See Trial Transcript, Vol. VI, at 142. The problem with this argument is that Soto Alvarez' statements are party admissions and not hearsay under Fed.R.Evid. 801(d)(2)(A). See United States v. Abou-Saada, 785 F.2d 1, 8 (1st Cir.), cert. denied sub nom. Tannous v. United States, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986). Honneus, which addressed plain error in the context of the admission of evidence under Federal Rule of Evidence 801(d)(2)(E), see 508 F.2d at 576-77, is therefore inapplicable. Soto Alvarez has never claimed, either at trial or on appeal, that the statements in question were involuntary. Consequently, we find no error in the admission of these statements.
 
 
 98
 The government concedes that the trial court failed to mention "foreign commerce" in its instructions on count 6. See Brief for the United States at 62. It correctly points out, however, that the failure to mention that conviction on this count could rest upon proof of travel in foreign commerce as well as interstate commerce benefitted rather than prejudiced the defendants. Because the indictment charged travel in both interstate and foreign commerce, and because there was sufficient evidence in the record to allow a jury to conclude that Soto had travelled in interstate commerce to promote the drug importation venture, see Trial Transcript, Vol. III, at 124, we agree with the government that Soto's conviction on count 6 should be affirmed.
 
 
 99
 Soto's convictions on counts 2-6 are affirmed. His conviction on count 1 is reversed.
 
 E. Angel Rivera Feliciano (No. 87-1627)
 
 100
 Rivera Feliciano was convicted on counts 1, 5, 11, and 12. He raises two issues on appeal. First, he argues that his convictions on counts 11 and 12 should be reversed on grounds of double jeopardy. Second, he argues that he is entitled to a new trial because one of the jurors saw him being escorted into the courthouse in handcuffs and chains.
 
 
 101
 1. The factual background for the double jeopardy claim is as follows. On April 17, 1985, Rivera Feliciano was indicted by a federal grand jury (the "1985 indictment") and charged with four drug-related counts: possession with intent to distribute 22.9 grams of heroin on or about April 12, 1985; distribution of 22.9 grams of heroin on or about April 12, 1985; possession with intent to distribute 53.8 grams of heroin on or about April 13, 1985; distribution of 53.8 grams of heroin on or about April 13, 1985, all in violation of 21 U.S.C. Sec. 841(a)(1). A superseding indictment added a fifth count, use of a communications facility to commit a crime in violation of 21 U.S.C. Sec. 843(b). On August 5, 1985, he pled guilty to counts 2 (distribution of heroin on April 12, 1985) and 5 (use of a communications facility); the remaining counts were dismissed at the request of the government. Rivera Feliciano was sentenced to six years imprisonment and fined $10,000 on count 2, and sentenced to two years imprisonment and fined $10,000 on count 5. The sentences were to run concurrently.
 
 
 102
 Rivera Feliciano claims that the heroin that formed the basis for the 1985 indictment was imported as part of the second shipment described in the 1986 indictment. He complains that it is unfair to allow the government to bring the possession charges in a second indictment because he had waived his right to a jury trial in the prior prosecution on the assumption that the government would not pursue those charges. Defendants in this situation would normally be expected to argue that the government has breached the terms of the plea agreement. See Ricketts v. Adamson, 483 U.S. 1, 107 S.Ct. 2680, 2689, 2691, 97 L.Ed.2d 1 (1987) (Brennan, J., dissenting) (describing plea agreements as "constitutional contracts" whose interpretation is "controlled by the principles of fundamental fairness imposed by the Due Process Clause"); United States v. Giorgi, 840 F.2d 1022, 1025-26 (1st Cir.1988); United States v. Vaughan, 715 F.2d 1373, 1376-77 & n. 1 (9th Cir.1983); Note, Double Jeopardy, Due Process, and the Breach of Plea Agreements, 87 Col.L.Rev. 142 (1987). Rivera Feliciano, however, has never argued, either at trial or on appeal, that the second indictment violated the terms of his plea agreement.
 
 
 103
 Instead, he argues that the Double Jeopardy Clause requires reversal of his conviction on count 11 (possession of heroin with intent to distribute) and count 12 (possession of cocaine with intent to distribute) because the prosecution of those counts arose from a fact situation on which the government had previously proceeded to judgment. To understand more clearly what Rivera Feliciano is arguing, we first explain what he is not arguing. Rivera Feliciano concedes that his guilty plea on counts 2 and 5 of the 1985 indictment did not cause jeopardy to attach with respect to the dismissed counts of that indictment. See Brief of Appellant Rivera Feliciano at 24.[21] Rivera Feliciano also does not argue that the offenses for which he was previously convicted are the "same" for purposes of either the Blockburger test or the same evidence test, see supra at 227-28, as those for which he was convicted in this case. In essence, he appears to be arguing that his prosecution on counts 11 and 12 of the 1986 indictment should be barred because the acts in question were part of the same transaction that formed the basis of the 1985 indictment. This argument, calling for adoption of a "same transaction" test under the Double Jeopardy Clause, has a distinguished lineage. Three Supreme Court Justices have advocated it. See Ashe v. Swenson, 397 U.S. 436, 453-54, 90 S.Ct. 1189, 1198-99, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring, joined by Douglas & Marshall, JJ.). Justices Brennan and Marshall continue to advocate this position. See, e.g., Borchardt v. United States, 469 U.S. 937, 940, 105 S.Ct. 341, 343, 83 L.Ed.2d 276 (1984) (Brennan, J., joined by Marshall, J., dissenting from denial of certiorari).
 
 
 104
 Assuming arguendo that Rivera Feliciano's claim would be upheld under the same transaction test, we must nonetheless reject his claim. Regardless of our views on the matter, the fact is that a majority of the Supreme Court has never held that the same transaction test is constitutionally required. See Garrett v. United States, 471 U.S. 773, 790, 105 S.Ct. 2407, 2417, 85 L.Ed.2d 764 (1985); Ashe v. Swenson, 397 U.S. 436, 448, 90 S.Ct. 1189, 1196, 25 L.Ed.2d 469 (1970) (Harlan, J., concurring); Max M. v. New Trier High School Dist. No. 203, 859 F.2d 1297, 1299 (7th Cir.1988); Henry v. McFaul, 791 F.2d 48, 52 n. 4 (6th Cir.1986); United States v. Thomas, 759 F.2d 659, 668 (8th Cir.1985); United States v. Marshall, 513 F.2d 274, 276 (5th Cir.1975), cert. denied, 423 U.S. 1048, 96 S.Ct. 773, 46 L.Ed.2d 636 (1976); United States v. Wilder, 463 F.2d 1263, 1266 n. 9 (D.C.Cir.1972). If anything, many federal appellate courts interpret the Court's decisions as having rejected the same transaction test. See United States v. Maranzino, 860 F.2d 981, 983 (10th Cir.1988); United States v. Brooklier, 637 F.2d 620, 623 (9th Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1514, 67 L.Ed.2d 815 (1981); Hardwick v. Doolittle, 558 F.2d 292, 298 (5th Cir.1977), cert. denied, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978). Under these circumstances, we do not think it is appropriate for us, as an inferior court, to adopt the same transaction test and blaze a precarious new trail in the unsettled jurisprudence of the Double Jeopardy Clause. See United States v. Huffman, 595 F.2d 551, 554-55 (10th Cir.1979); United States v. Garner, 529 F.2d 962, 971 (6th Cir.), cert. denied, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 124 (1976); United States v. Smith, 470 F.2d 1299, 1302 (5th Cir.), cert. denied, 411 U.S. 952, 93 S.Ct. 1929, 36 L.Ed.2d 415 (1973); United States ex rel. Brown v. Hendrick, 431 F.2d 436, 440 (3d Cir.1970), cert. denied, 402 U.S. 976, 91 S.Ct. 1677, 29 L.Ed.2d 141 (1971); see also Thigpen v. Roberts, 468 U.S. 27, 36, 104 S.Ct. 2916, 2921, 82 L.Ed.2d 23 (1984) (Rehnquist, J., dissenting) (calling for urgent resolution by Supreme Court of ambiguities in determining what offenses are the same for double jeopardy purposes).
 
 
 105
 2. The factual background for appellant's second claim is as follows. The jury received its closing instructions and commenced deliberations on April 20, 1987. No verdict had been reached by the end of the day. The next morning, one juror arrived at the courthouse unexpectedly early. As she opened a stairway door in the building, she briefly saw defendants Soto Alvarez and Rivera Feliciano, in handcuffs and chains, being escorted to the courtroom by marshals. The jury resumed its deliberations later and reached a verdict that morning.
 
 
 106
 Rivera Feliciano's counsel, joined by counsel for the other defendants, immediately requested that the jury be polled and also moved for a mistrial. The district court conducted a hearing on this issue before publishing the jury's verdict. See Trial Transcript, Vol. XIII, at 3-11. He found that the marshals' conduct was blameless and noted that the single juror's viewing of the defendants was momentary and inadvertent. He concluded that the incident had no effect on the jury's impartiality and denied both the motion to poll the jury before the publication of the verdict and for the declaration of a mistrial. See id. at 11. On appeal, Rivera Feliciano argues that the denial of the mistrial motion constitutes reversible error because the juror's viewing of the two shackled defendants was so prejudicial that it made the entire jury incapable of rendering an impartial verdict. Declaring a mistrial was the only way in which this prejudice could have been cured.
 
 
 107
 We have previously stated that "[i]n the absence of a showing of prejudice ... a fleeting glance by jurors of a defendant outside the courtroom in handcuffs does not justify a new trial." United States v. Ayres, 725 F.2d 806, 813 (1st Cir.), cert. denied, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984); accord United States v. Williams, 809 F.2d 75, 83 (1st Cir.1986), cert. denied, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 377 (1987). Rivera Feliciano merely raises the possibility of prejudice; he certainly has not met the "heavy burden" of proving actual prejudice to justify a mistrial. Dupont v. Hall, 555 F.2d 15, 17 (1st Cir.1977). It is true that the trial court denied Rivera Feliciano's request to poll the jury before the publication of the verdict, but that denial appears to have been motivated by a desire to avoid exacerbating the situation. See Williams, 809 F.2d at 85.[22] If Rivera Feliciano truly believed that the jury had been prejudiced, he could have requested a post-trial voir dire. See id.; Trial Transcript, Vol. XIII, at 11. He has only himself to blame for the failure to prove actual prejudice.
 
 
 108
 Rivera Feliciano's convictions on counts 1, 5, 11, and 12 are affirmed.
 
 F. Victor Carrera Perez (No. 87-1857)
 
 109
 Carrera, who was convicted on counts 1 and 11, raises one issue on appeal. He states that only three witnesses testified against him at trial: Panzardi, Nieves, and Agent Domingo Carrasquillo. The trial court prevented his trial attorney from cross-examining each of these witnesses as to details about the cold-blooded murder of Avelino Cabrera. This restriction, Carrera argues, prevented him from attacking the character and credibility of these witnesses, particularly Panzardi, and thus violated his right to confrontation as guaranteed by the Sixth Amendment. Because this error cannot be considered harmless, Carrera submits that he is entitled to a new trial on both counts for which he was convicted.
 
 
 110
 The law regarding restrictions on the scope of cross-examination is well-settled in this Circuit. A defendant has a constitutionally guaranteed right to cross-examine witnesses testifying against him. See Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). The purpose of cross-examination is to impeach the credibility of a witness and to explore her motives and biases. See United States v. Silvestri, 790 F.2d 186, 190 (1st Cir.), cert. denied, 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986). Despite its importance, the right to cross-examine is not absolute. See United States v. Rivera-Santiago, 872 F.2d at 1084. Once the defendant has been afforded a reasonable opportunity to question a witness' veracity and motivation, the trial judge enjoys broad discretion in determining the scope and extent of cross-examination. See Silvestri, 790 F.2d at 190; United States v. Kepreos, 759 F.2d 961, 965 (1st Cir.), cert. denied, 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985). "The court need not permit unending excursions into each and every matter touching upon veracity if a reasonably complete picture has already been developed." United States v. Fortes, 619 F.2d 108, 118 (1st Cir.1980). The trial judge must balance the probative value of the proposed inquiry against the twin dangers of unfair prejudice and unnecessary delay in the proceedings. See United States v. Tracey, 675 F.2d 433, 439 (1st Cir.1982). The trial judge's determination will be reviewed under an abuse of discretion standard. See Rivera-Santiago, 872 F.2d at 1084. Two factors that we have previously considered when reviewing whether a trial court abused its discretion are (a) whether the character traits in question were otherwise sufficiently explored, and (b) the importance of the witness' testimony to the prosecution's case. See Tracey, 675 F.2d at 437-38.
 
 
 111
 Carrera has not convinced us that the district court abused its discretion. The defendants were given a more than reasonable opportunity to attack the credibility and biases of these three witnesses. Panzardi, the prosecution's principal witness, was cross-examined from late afternoon on the fourth day of trial to early morning on the sixth day of trial. See Trial Transcript, Vols. IV-VI. Defense counsel were allowed to bring to the attention of the jury Panzardi's extensive record of past criminal activity, the fact that he had committed perjury on numerous previous occasions, the fact that Panzardi had been present at the time of Cabrera's murder, the fact that he had pled guilty to violating Cabrera's civil rights and had been sentenced to a 99-year term of imprisonment, and the terms of Panzardi's plea agreement with federal prosecutors. Nieves and Carrasquillo were also cross-examined thoroughly. Their responses made it perfectly clear that Panzardi and Nieves were involved in a plot to murder Cabrera, who was to testify against Panzardi in the latter's upcoming trial.
 
 
 112
 The only area in which the district court restricted cross-examination was the gruesome details of the murder. This decision appears to be well within the district court's discretion. The incremental probative value of this line of inquiry was minimal. The purpose of the proposed questioning was to attack Panzardi's character and thus his credibility. Panzardi's credibility, however, had been more than sufficiently explored.[23] The jury was well aware of this critical witness' psychopathic character and his record of criminal activity, including perjury. Under these circumstances, evidence regarding the gruesome details of Cabrera's murder would have been largely cumulative. The district court was justified in believing that what probative value it had was outweighed by the delays that it would have caused. The government persuasively argues that allowing questioning in this area would have unduly lengthened and complicated the trial. Nitpicking over the gory details of Cabrera's murder would have deflected attention from the focus of this lawsuit: the guilt or innocence of these defendants on these charges. As pithily noted by Oliver Wendell Holmes, limitations on the examination of collateral issues are ultimately a "concession to the shortness of life." Reeve v. Dennett, 145 Mass. 23, 28 (1887) (quoted in United States v. Foley, 871 F.2d 235, 238 (1st Cir. 1989)).
 
 
 113
 The convictions of Victor Carrera Perez on counts 1 and 11 are affirmed.
 
 
 114
 * * *
 
 
 115
 * * *
 
 
 116
 To recapitulate: the convictions of Blanca Garcia Rosa, Angel Rivera Feliciano, and Victor Carrera Perez are affirmed. The convictions of Pedro Soto Alvarez on counts 2-6 are affirmed. The conviction of Pedro Soto Alvarez on count 1 is reversed. His case is remanded to the district court for resentencing. The convictions of Eduardo Rivera Ortiz and Jose Heredia Nieves are vacated, and their cases remanded to the district court for a new trial.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 Panzardi was unable to determine how to process the hydromorphine into a usable form. Consequently, he discarded it and refused to pay Mendez and his associate for that particular drug
 
 
 [2]
 On April 30, 1986, Panzardi was sentenced to 99 years in prison. He is currently appealing his conviction to this Circuit. See United States v. Panzardi, 879 F.2d 975 (1st Cir.1989)
 
 
 [3]
 It is possible that Rivera Ortiz could also have been held liable for this count under a different theory. The jury found Rivera Ortiz guilty of conspiracy to possess heroin with intent to distribute. As a conspirator, he is vicariously liable for the acts of his coconspirators, provided that the latter acts were within the scope of the conspiracy, were intended to further the conspiracy, and were reasonably foreseeable as a necessary or natural consequence of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 645-48, 66 S.Ct. 1180, 1183-84, 90 L.Ed. 1489 (1946); United States v. Cranston, 686 F.2d 56, 62 (1st Cir.1982). See generally Nye & Nissen v. United States, 336 U.S. 613, 619-20, 69 S.Ct. 766, 769-70, 93 L.Ed. 919 (1949) (discussing the overlap between liability as an aider and abetter and vicarious liability as a principal under the Pinkerton rule). There can be no doubt that the acts charged in Count 11 (possession with intent to distribute heroin) meet the requirements for the imposition of vicarious liability on a conspirator in a conspiracy to possess heroin with intent to distribute. See, e.g., United States v. Ordonez, 737 F.2d 793, 807 (9th Cir.1983); United States v. Parrish, 736 F.2d 152, 157 (5th Cir.1984); United States v. Newbern, 731 F.2d 744, 749-52 (11th Cir.1984). Because the government has not argued that the jury was instructed on this theory, however, we do not rely on it as a basis for our decision
 
 
 [4]
 The government and the defendant offered conflicting accounts of the arrest during the suppression hearing. The trial court found the government's version of the incident more credible. See Trial Transcript, Vol. XI, at 66. The findings of a district court made after a suppression hearing are binding on an appellate court unless they are clearly erroneous. See United States v. McHugh, 769 F.2d 860, 863 (1st Cir.1985). Although his brief contains factual assertions that are inconsistent with the district court's factual findings, Rivera Ortiz has not directly challenged the district court's findings. We hold that the defendant has failed to prove that the district court's factual findings are clearly erroneous, and therefore accept those findings as valid
 
 
 [5]
 The agent testified that cocaine was usually retailed in "gram bags" such as these. See Trial Transcript, Vol. XI, at 26-27, 127. These three bags contained 99 mg. of cocaine. See id. at 131
 
 
 [6]
 The government argues that Rivera Ortiz' challenge should fail because he failed to assert that he had standing. We find this attitude too persnickety. When the government itself has acknowledged that the house and the guns belonged to Rivera Ortiz, we refuse to dismiss the Fourth Amendment claim for lack of standing
 
 
 [7]
 The prosecution did not seek to introduce evidence about the cocaine seized during the arrest as part of its case-in-chief
 
 
 [8]
 Even if the defendant's knowledge of drugs at the time of the conspiracy was at issue, we fail to understand how possession of drugs nineteen months after the conspiracy had ended would be probative of that issue. We discuss this point in greater detail below
 
 
 [9]
 Panzardi testified that he told Rivera Ortiz that he needed the money to buy a plane to make a trip "to go and pick up some cocaine and some heroin in Colombia." See Trial Transcript, Vol. III, at 163-64
 
 
 [10]
 See J. Weinstein & M. Berger, 2 Weinstein's Evidence 404, at 404-28 & n. 2
 
 
 [11]
 The jury was instructed accordingly. See Trial Transcript, Vol. XII, at 25-26
 
 
 [12]
 The defendant alleges that his case-in-chief did not make identity an issue in this case. Regardless of the purpose of the testimony of Heredia's only witness, this argument is meritless. It seems to us that identity is an essential element of any crime and always at issue unless the defendant admits to having committed the act in question. See United States v. Danzey, 594 F.2d 905, 911-15 (2d Cir.), cert. denied sub nom. Gore v. United States, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979); United States v. Baldarrama, 566 F.2d 560, 568 n. 9 (5th Cir.), cert. denied, 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1978); 2 Weinstein's Evidence p 404, at 404-113; see also United States v. Rivera, 872 F.2d 507, 512 (1st Cir.1989) (refusing to treat an issue as undisputed in absence of concession by defendant). Heredia had not conceded that he had purchased cocaine from Panzardi. Under these circumstances, we believe that the government would even have had the right to use extrinsic act evidence in its case-in-chief to prove identity, subject to the requirements of Rules 404(b) and 403 of the Federal Rules of Evidence
 
 
 [13]
 If the government's goal was to dispel the confusion surrounding names, that goal could easily have been achieved by recalling Panzardi and Nieves and having them state unequivocally that they were referring to the defendant, Jose Heredia Nieves, and not his brother, Guillermo Heredia Nieves
 
 
 [14]
 At oral argument, counsel for Garcia argued that the evidence presented at trial proved that there were two conspiracies rather than one. This argument is identical to the variance argument made by Heredia, and we reject it for the same reasons that we rejected his argument. See supra at 223
 
 
 [15]
 Because the government has not contended otherwise, we assume that Soto Alvarez made an appropriate pretrial motion to dismiss the conspiracy count on double jeopardy grounds. The record does not indicate why Soto Alvarez did not seek an interlocutory appeal on this issue pursuant to Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977)
 
 
 [16]
 This is an issue that Chief Justice (then Justice) Rehnquist has urged the Supreme Court to resolve urgently. See Thigpen v. Roberts, 468 U.S. 27, 36, 104 S.Ct. 2916, 2921, 82 L.Ed.2d 23 (1984) (Rehnquist, J., dissenting); see also Illinois v. Zegart, 452 U.S. 948, 101 S.Ct. 3094, 69 L.Ed.2d 961 (1981) (Burger, C.J., Blackmun & Rehnquist, JJ., dissenting from denial of certiorari)
 
 
 [17]
 This procedural matrix usually applies to pretrial motions to dismiss an indictment on double jeopardy grounds. See United States v. Ragins, 840 F.2d 1184, 1191-92 (4th Cir.1988); see also Note, The Burden of Proof in Double Jeopardy Claims, 82 Mich.L.Rev. 365 (1983) (making arguments for placing burden of proof on government that turn on the fact that the motion is made before trial). Some courts have applied the same procedural matrix even when the motion is reviewed after trial. See, e.g., United States v. Loyd, 743 F.2d 1555, 1563 (11th Cir.1984); United States v. Adamo, 742 F.2d 927, 946 (6th Cir.1984), cert. denied sub nom. Freeman v. United States, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985); United States v. Kalish, 690 F.2d 1144, 1147 (5th Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). We do not need to decide in this case whether a different procedural matrix is required when no interlocutory appeal is taken and the issue is being reviewed after trial, because the government has not sought the application of an alternative procedural matrix
 
 
 [18]
 The government has not argued that it could not have discovered the existence of the broad conspiracy at the time that it prosecuted Soto Alvarez for the narrow conspiracy. See United States v. Ragins, 840 F.2d 1184, 1193 (4th Cir.1988) (discussing the undiscovered crime exception to the double jeopardy rule)
 
 
 [19]
 In his Pro Se Opposition to the Government Brief at 11, Soto Alvarez states that Panzardi's brother would have testified that there was no heroin in the first shipment from Venezuela
 
 
 [20]
 The defendant concedes that no objection was made at trial with respect to any of these errors and that they therefore must be assessed under a plain error standard. We do not need to apply a plain error standard because we conclude that the trial court committed no errors even under the normal standard of review
 
 
 [21]
 This position is consistent with that of many federal appellate courts. See Fransaw v. Lynaugh, 810 F.2d 518, 525 (5th Cir.) (noting that several of the appellate cases involving pretrial dismissals rested at least partially on the grounds that jeopardy had not attached to the dismissed count), cert. denied, 483 U.S. 1008, 107 S.Ct. 3237, 97 L.Ed.2d 742 (1987); United States v. Vaughan, 715 F.2d 1373, 1376 n. 2 (9th Cir.1983) (stating that when a defendant enters a plea of guilty to one of the crimes with which he has been charged, jeopardy ordinarily attaches only as to that crime upon acceptance of the plea by the court)
 
 
 [22]
 We reiterate our preference for remedial action after an accidental observation of a defendant in custody. See Williams, 809 F.2d at 84. The trial court, however, enjoys broad discretion in determining the nature and extent of any inquiry into juror bias. See id. at 85. The remedial action fashioned by the district court in this case seems well within the scope of its discretion. In fact, as the government points out, the defendants have not even appealed the denial of their motion to poll the jury
 
 
 [23]
 We reach a similar conclusion with respect to Nieves and Carrasquillo